UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEROME MORRIS,

          *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

          *Defendant*.

_____/

CASE NO. 2:18-12090

DISTRICT JUDGE ARTHUR J. TARNOW
MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 12, 13)**

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 12), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 13), be **DENIED**, and this case be **REMANDED** for further proceedings.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Jerome Morris's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the

1

undersigned Magistrate Judge. (R. 2). Currently before the court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 12, 13). Plaintiff has also filed a response to Defendant's motion. (R. 14).

Plaintiff filed his application for DIB on May 14, 2015,[1] alleging onset on April 20, 2014. (R. 10 at PageID.294-300). His claim was denied at the initial level on September 22, 2015. (*Id.* at PageID.180). After an administrative hearing was held at Plaintiff's request, (*id.* at PageID.124-165), Administrative Law Judge (ALJ) Lawrence E. Blatnik issued a decision finding that Plaintiff had not been under a disability from his alleged onset date through the date of the decision, August 16, 2017, (*id.* at PageID.100-123). The Appeals Council denied Plaintiff's request for review. (*Id.* at PageID.42-48).[2] This action followed. (R. 1).

---

[1] The ALJ stated that Plaintiff filed his application on May 11, 2015. (R. 10 at PageID.103). Neither party has expressed any concern about this discrepancy, and I cannot see how it would affect the outcome, as the ALJ found that Plaintiff was not under a disability between his alleged onset date, April 20, 2014, and the date of the decision, August 16, 2017. (*Id.* at PageID.119).

[2] Plaintiff submitted additional evidence to the Appeals Council. (*Id.* at PageID.49-94). In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered in substantial evidence review.

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining solely whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Social Security Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

3

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

4

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the alleged onset date of April 20, 2014, through the date of the decision, August 16, 2017. (R. 10 at PageID.119). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.105). Next, the ALJ determined Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, status post lumbar fusion; peripheral arterial disease, status post femoral popliteal bypass; history of deep vein thrombosis with

corrective surgery; osteoarthritis; degenerative joint disease/tendinosis of the right shoulder; and an adjustment disorder. (*Id.* at PageID.106). The ALJ found that Plaintiff's plantar fasciitis, hypertension, hyperlipidemia, obesity, and alcohol use were not severe impairments, and he had no medically determinable substance use disorder. (*Id.* at PageID.106-107). He did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at PageID.107-110).

Before proceeding further, the ALJ found Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), and

> can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently. He can sit for six hours, with a need to alternate to standing for three to five minutes after every 20 to 30 minutes of sitting; and can stand and walk for six hours, with a need to alternate to sitting for three to five minutes after every 20 to 30 minutes of standing or walking. The claimant is limited to occasional reaching overhead and frequent[] reaching below head level with the right upper extremity. He can frequently handle and finger with both hands. The claimant can frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop and crouch; and frequently balance, kneel, and crawl. He can tolerate occasional exposure to vibration. In addition, the claimant can perform simple, routine[,] and repetitive tasks.

(*Id.* at PageID.110). At steps four and five, the ALJ concluded that Plaintiff was unable to perform any of his past relevant work, but that jobs he could perform existed in significant numbers in the national economy—for example, office helper (180,000 jobs nationally), laundry worker (30,000 jobs nationally), and cashier (800,000 jobs nationally). (*Id.* at PageID.117-19). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time. (*Id.* at PageID.119).

### E.  Administrative Record

#### 1.  Medical Evidence

I have thoroughly reviewed the medical record. In lieu of summarizing Plaintiff's medical history here, I will reference and provide citations to the record as necessary in my discussion of the parties' arguments.

#### 2.  Application Reports and Administrative Hearing

##### i.  Plaintiff's Function Report

Plaintiff completed a function report on June 15, 2015. (R. 10 at PageID.322-29). In it, Plaintiff explained that he was in constant pain—his back, legs, and feet hurt; his legs and feet swelled; and his knees hurt when he stood, walked, or sat. (*Id.* at PageID.322). "It hurts to stand, walk, sit, drive, lay, bend, twist, cough, or sneeze." (*Id.*). From the time he woke up until he went to bed, he did "[n]othing but try to deal with the pain." (*Id.* at PageID.323). Because his sleep was also troubled by pain, he got up around noon and took a pain pill, which made him "tired but still in pain." (*Id.*).

Before onset, Plaintiff had been able to work, play sports, socialize, worship, and have "relationships." (*Id.*). Now he suffered from constant pain in his back, legs, knees, and feet. (*Id.*). Many aspects of personal care caused him pain: it hurt to bend to put on his pants, shoes, and socks; it hurt to bend, twist, and lift his feet during bathing or showering; and it hurt too much to reach, stand, and twist as necessary to shave his head. (*Id.*). Using the toilet also caused him discomfort, as bending or squatting hurt, his feet would go to sleep, and he had "to strain due to the pain pills which causes blood in my stool." (*Id.*).

Once a week he prepared his own meals, which consisted of TV dinners, hamburgers, and chips. (*Id.* at PageID.324). Making food took him several hours because he could not stand long; he had to sit on a stool near the stove to cook a hamburger. (*Id.*). He could no longer grill. (*Id.*). And sometimes he was in too much pain to eat. (*Id.*).

As for housework, he was able to load the dishwasher or washing machine—taking about 30 minutes to do each chore, once a week—but then his back, leg, and foot pain forced him to sit down. (*Id.*). He could fold clothes while sitting. (*Id.*). His daughter sometimes called and asked if he had done his dishes "because she knows [he] won't ask for help." (*Id.*). Meanwhile, his son did the yardwork and "lift[ed] anything heavy." (*Id.* at PageID.325).

When going out, Plaintiff could drive and go out alone, though when he drove "the smallest things upset [him] now." (*Id.* at PageID.325, 327). He shopped for groceries and household goods for about 45 minutes every couple of weeks, "mov[ing] slow and stiff." (*Id.* at PageID.325). He remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (*Id.* at PageID.326). Before onset, he had enjoyed going to the gym three to four days a week, bowling in two leagues, golfing, fishing, shooting, and dancing. (*Id.*). Now pain prevented him from doing any of his hobbies. (*Id.*).

Plaintiff stayed at home and did not spend time with other people, which hurt "both physically and mentally." (*Id.*). Although he used to be an usher at his church, pain now kept him from standing during the service. (*Id.* at PageID.327). Further, he had problems getting along with family "due to [his] finances from not working." (*Id.*). He felt sad most of the time and did not want to be with others. (*Id.*). And he said he did not get along well

with authority figures, explaining, "I don't like to be asked foolish questions by authority figures." (*Id.* at PageID.328). During his time working at the Michigan Department of Corrections, his issues getting along with others had earned him a demotion of "two levels" in 2009 and "several disciplinary actions" between 2010 and 2012. (*Id.*).

His conditions affected his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, hear, climb stairs, see, remember, complete tasks, concentrate, and get along with others. (*Id.* at PageID.327). He could lift five pounds without pain, and walk for about two minutes before pain set in. (*Id.*). He could walk about four minutes at a time, but in "serious pain," before needing to stop and rest for a half hour. (*Id.*). His attention span was 20 minutes. (*Id.*). He could follow written instructions after reading them several times, and spoken instructions "as long as it is said loud enough." (*Id.*).

Because he was "in so much pain all the time," Plaintiff did not handle stress or changes in routine well. (*Id.* at PageID.328). He was afraid of dying from blood clots, as his father had, and he felt depressed. (*Id.*).

A doctor had prescribed a walker and a cane; Plaintiff used the cane when the weather was bad because his back and knees hurt more then. (*Id.*). Some of Plaintiff's medications caused side effects: Percocet made him sleepy, caused constipation, and suppressed his appetite; Xarelto gave him dry, peeling, and itchy skin; Ambien caused him to wake up dizzy and disoriented; and Valium made his mind race, which also made it hard to sleep. (*Id.* at PageID.329).

In closing, Plaintiff added that on April 29, 2015, he had been diagnosed with Peripheral Artery Disease at the University of Michigan, Ann Arbor, and that the stent that had been placed in his left femoral artery in February 2006 was no longer working. (*Id.*)

### ii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on April 20, 2017. (R. 10 at PageID.124). Plaintiff was 53 years old at the time of the hearing. (*Id.* at PageID.132). He drove short distances a few times a week; a friend had driven him to the hearing. (*Id.* at PageID.134). He had completed high school and two semesters of college in general studies. (*Id.* at PageID.134-35). He had gotten a DUI in 2002. (*Id.* at PageID.135).

From 2002 until April 2014, Plaintiff had worked for the Michigan Department of Corrections as a shift supervisor. (*Id.*). In that position, he had not had any hiring or firing authority, but had directed about 50 other corrections officers in the performance of their duties. (*Id.* at PageID.135-36). He had had the same duties as line staff, including heavy lifting and carrying and restraining inmates. (*Id.* at PageID.136). In April 2014, he had decided to leave that job because he could no longer perform his duties without significant pain. (*Id.* at PageID.136-37). Since leaving the Department of Corrections, he had not looked for other work. (*Id.* at PageID.137-38).

Plaintiff explained his back problem began after a 2004 "incident with one of the inmates," and that in 2014 he had had surgery, "after trying everything else." (*Id.* at PageID.138). But surgery had not helped. (*Id.*). Plaintiff also had problems with his right shoulder that had started "out of the blue" the previous October, and he had shoulder

10

surgery scheduled for May. (*Id.*). He had had a bypass in his left leg the previous April and clotting in his right leg after his 2014 back surgery. (*Id.* at PageID.139, 149).

Plaintiff complained that he had swelling in his legs and no feeling in his feet. (*Id.*). He had been told to elevate his leg, but never elevated it for longer than ten minutes because lying back in his recliner hurt his back, neck, and shoulder. (*Id.* at PageID.139-40). Back and shoulder pain plagued him constantly. (*Id.* at PageID.140). His back pain had worsened over the last couple of years, and he had noticed "added stiffness" after surgery. (*Id.* at PageID.140-41). Sitting for long periods of time made pain shoot down his slower back and legs and caused swelling and stiffness; after sitting in the hearing room for about 20 minutes, he said, he was in a lot of pain—his back and shoulder hurt, and his hands were throbbing. (*Id.* at PageID.140-42).

Additionally, he had suffered from rheumatoid arthritis and ankylosing spondylitis since 2014, and both had worsened. (*Id.* at PageID.147-48). After a recent MRI, his doctor had talked about possibly doing more surgery, because the hardware from a previous surgery was pinching a nerve. (*Id.* at PageID.148-49). His wrists had had issues since 2014, and his hand for about six months. (*id.* at PageID.149). He could not feel his feet and got shooting pain from his ankle to the groin area. (*Id.* at PageID.150). He also had some neck pain. (*Id.*). No position was particularly comfortable for him, and the pain made it difficult to focus on anything. (*Id.*).

He estimated he could walk about half a block before needing to rest and stand for about a minute. (*Id.*). He thought he could probably lift three to five pounds or carry a gallon of milk in his (non-dominant) left hand. (*Id.* at PageID.143). He was not able to lift

his right arm overhead, and he had problems using his hands to grasp things or pick things up. (*Id.* at PageID.142-43).

To help treat the pain, Plaintiff took Percocet or Tylenol, which made him fall asleep and then wake up in pain. (*Id.* at PageID.141). He also used medical marijuana daily to help with the pain and inflammation, which helped "[s]omewhat, but not like a pain medication . . . like a Percocet." (*Id.* at PageID.143-44).

He had problems falling asleep and staying asleep because of his shoulder, which made it difficult to find a comfortable position. (*Id.* at PageID.144). Asked whether he had problems taking care of his personal grooming, bathing, or dressing himself, he said he could bathe himself, but had trouble shaving due to his shoulder and hands, and preferred to wear clothes with an elastic waist because of "where they did the bypass." (*Id.* at PageID.144).

Most of the time he ate out, and he used plastic and paper eating utensils as much as possible, as well as straws, "because it's hard to hold a cup up." (*Id.* at PageID.144-45). His neighbor shoveled for him during the winter. (*Id.* at PageID.145). And his daughter did his laundry because he did not have a washer and dryer in his house. (*Id.*).

Plaintiff went online a few times a week, and had a Facebook account. (*Id.* at PageID.146). He had not been out of state since 2014. (*Id.*). As for hobbies, he used to like working out, biking, fishing, bowling, and golfing, but he had not done any of those things in the past couple of years. (*Id.*).

Lastly, Plaintiff mentioned that a CT scan had showed some nodules in his lung, which were being monitored; Plaintiff was to notify his doctor if he had a persistent cough or any shortness of breath. (*Id.* at PageID.151).

### iii.  The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Norman Abeles also testified at the hearing. (*Id.* at PageID.152). He began by classifying Plaintiff's past work as a jailer, which was skilled work, classified as light but performed at heavy. (*Id.* at PageID.153-54).

The ALJ then posed his first hypothetical:

[A]ssume we have an individual [who] can lift or carry, push or pull 20 pounds occasionally and 10 pounds frequently; could sit, stand or walk alternately six hours, but would need to change position every 20 to 30 minutes for short periods of time, we'll say three to five minutes at a time.

He could never climb ladders, ropes or scaffolds. He could frequently climb ramps or stairs as well as frequently balance, stoop, kneel, crouch and crawl; limited to occasional exposure to vibration. He would also be limited to simple, routine, repetitive tasks . . . .

(*Id.* at PageID.154-55). The VE testified that work would be available at the light exertional level for the hypothetical person, such as office helper (180,000 jobs nationally), laundry worker (30,000 nationally), and cashier (800,000 jobs nationally). (*Id.* at PageID.155).

The ALJ moved on to his second hypothetical, which built off the first, but also added manipulative restrictions: "Limited to overhead reaching with the right dominant arm; frequent reaching below head level with the right arm. And he could do frequent but not constant handling or fingering with both hands." (*Id.*) The same jobs would be available in the same numbers, the VE said. (*Id.* at PageID.156).

13

Next, the ALJ asked whether the VE's answers would change if the hypothetical person's pain would cause him to be off task for 25 percent or more of the workday. (*Id.*). The VE explained that anything above 10 percent of time off task or more than one absence per month would be work preclusive. (*Id.*).

Plaintiff's attorney asked whether the VE's answers to hypothetical two would change with an additional limitation to only occasional use of the hands; the VE responded that all light work would be eliminated. (*Id.* at PageID.157-58, 161).

Finally, the VE explained that for any of the above factors not addressed by the Dictionary of Occupational Titles, he had relied on his experience of 31 years, and he had relied on SkillTRAN, the Job Browser Pro, Department of Labor data, the U.S. Publishing Company in Kansas City, and Occupational Outlook Quarterly. (*Id.* at PageID.157).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[3] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§

---

[3] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for DIB in May 2015, I consider his case under the old rule.

404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S.

16

at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

17

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

**G. Analysis**

Where, as here, a plaintiff proceeds without counsel, the court must liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). But even *pro se* complaints must satisfy basic pleading requirements. *See Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).

Plaintiff's two-page motion for summary judgment comprises four bullet points recounting record evidence of his physical impairments, as well as a complaint that the record did not include a "Second Opinion" issued by the Cleveland Clinic in February 2018. (R. 12 at PageID.1016-17). Construing the pleadings liberally, and referring to the

18

brief filed with the Appeals Council by Plaintiff's former attorney, Defendant understands Plaintiff to be challenging: (1) whether the ALJ properly evaluated Plaintiff's apparent plantar fasciitis at step two; (2) whether substantial evidence supports the ALJ's RFC determination and resulting step-five determination; and (3) whether Plaintiff is entitled to remand based on evidence generated after the ALJ's decision. (R. 13 at PageID.1023-1024). Defendant responds that the ALJ's opinion is supported by substantial evidence.

### 1.  Substantial Evidence Supports the ALJ's RFC Assessment

I will first address how the ALJ treated Plaintiff's April 2014 diagnosis of plantar fasciitis. At step two, the ALJ noted that Plaintiff was diagnosed with plantar fasciitis in April 2014, but that the record contained no evidence of treatment for plantar fasciitis. (R. 10 at PageID.106) (citing *id.* at PageID.375). Thus, the ALJ found plantar fasciitis was not a "severe" impairment. (*Id.*).

Plaintiff does not argue his plantar fasciitis was in fact severe; as best as I can tell, he is concerned that he was harmed because the ALJ did not recognize that his plantar fasciitis was a misdiagnosis. (R. 12 at PageID.1016). He says:

> Evidence in the Administrative Record supports "Misdiagnosed" case of Planters Fasciitis issued (April 22, 2014 at Allegiance hospital ER [Tr. 65] Evidence in the Administrative Record supports stent which was placed in left femoral artery on February 1, 2006 at the University of Michigan had failed and 80% of the arteries were blocked. [Tr. 341, 443-50]

(R. 12 at PageID.1016) (*sic* throughout). Thus, Plaintiff seems to suggest that his bilateral foot pain and swelling in April 2014 was actually due to the failure of the stent in his left femoral artery, not plantar fasciitis.

19

The record, including Plaintiff's own citations, offers little support for this theory. In June 2014, Plaintiff went to the emergency department for back pain radiating into his left leg; the doctor explained there was no evidence of vascular occlusion. (*Id.* at PageID.378-81). An ultrasound the same day revealed arterial patency—*i.e.*, no obstructions—in the lower left extremity. (*Id.* at PageID.387). About a year after his diagnosis of plantar fasciitis, however, Plaintiff reported pain in his left leg "similar to the claudication he had prior to his stent placement in 2006 as he is unable to walk at a brisk pace anymore." (*Id.* at PageID.476-78). Imaging and a Doppler study at that time showed the stent was occluded from the proximal portion to the mid-distal thigh. (*Id.* at PageID.490).

Defendant, meanwhile, surmises that perhaps Plaintiff's symptoms that day in April 2014 were caused by arthritis, rather than plantar fasciitis. (R. 13 at PageID.1028-29). Defendant notes that a treatment note from a rheumatologist that same month says Plaintiff was "thought in the ER to have plantar fasciitis," (R. 10 at PageID.543); the rheumatologist ultimately diagnosed him with arthritis, (*id.* at PageID.546).

Regardless of the exact cause of Plaintiff's foot pain and swelling, I do not see how Plaintiff was harmed by any misunderstanding on the part of the ALJ; the ALJ acknowledged and accounted for the various impairments that cause him foot pain, including his peripheral arterial disease, history of deep vein thrombosis, and osteoarthritis. (*Id.* at PageID.106, 115).

Second, I consider whether substantial evidence supports Plaintiff's RFC as determined by the ALJ, with particular focus on Plaintiff's physical impairments, since

Plaintiff's brief is limited to a discussion of physical complaints. *See* (R.12). In his motion and response, Plaintiff enumerates a list of evidence without any explanation of its significance:

(1) The "misdiagnosed" plantar fasciitis and later occlusion of Plaintiff's left leg, (R. 10 at PageID.1016), as discussed in detail above, which necessitated a femoral-popliteal bypass in April 2016, (*id.* at PageID.1017);

(2) Plaintiff's November 2014 spinal fusion surgery and post-operative blood clots in his right leg, (*id.* at PageID.1016);

(3) Evidence of spinal stenosis, narrowing of both foramen, and nerve root impingement of the left foraminal nerve at the L2-L3 levels after Plaintiff's lumbar fusion, (R. 14 at PageID.1046);

(4) When Plaintiff was discharged after his bypass surgery, he was issued a "LACE index" score of nine,[4] (R. 14 at PageID.1047);

(5) After his April 2016 bypass surgery, Plaintiff was readmitted to the hospital for a wound infection, during which he also developed a rash as an allergic reaction to an antibiotic. (R. 14 at PageID.1047).

The ALJ acknowledged and explained how he accounted for nearly all the evidence Plaintiff names. (R. 10 at PageID.112 (spinal fusion surgery; spinal stenosis, moderate narrowing of the left foramen, mild to moderate narrowing of the right foramen, and left

---

[4] Hospital paperwork explains that LACE "is a risk assessment tool to prospectively identify patients at risk for unplanned Readmission or Death within 30 days of discharge"; Plaintiff scored 9 out of 19, in the "moderate" range. (R. 10 at PageID.589-90).

foraminal nerve root impingement), 114 ("provoked" right lower extremity deep vein thrombosis post-spinal fusion), 115 (left femoral popliteal bypass procedure and wound infection post-bypass)). Excepted are two pieces of evidence that did not exist at the time the ALJ rendered his decision, (R. 12 at PageID.1017), which are discussed further below. To the extent Plaintiff asks the court to re-weigh any piece of evidence, I must decline— "[a]rguments which in actuality require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual." *Albanna v. Comm'r of Soc. Sec.*, No 15-14264, 2016 WL 7238925, at *1, *12 (E.D. Mich. Nov. 22, 2016) (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)).

Though the ALJ did not explicitly mention Plaintiff's LACE score or the rash he developed as an allergic reaction to antibiotics in April 2016, the ALJ is not required to specifically discuss every piece of evidence in the record to demonstrate that it was considered. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x. 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that[ ] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"); *Loral Defense Sys.-Akron v. N.L.R.B*, 200 F.3d 436, 453 (6th Cir. 1999) ("[T]hat the ALJ's opinion failed to discuss all of the testimony and evidence presented to him does not mean that the ALJ 'failed to consider' the evidence."); *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) ("[A]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (quoting *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). And Plaintiff does not explain how

either his LACE score or wound infection and allergic reaction to antibiotics undermines the ALJ's RFC determination. The LACE score speaks specifically to the 30 days following discharge from the hospital, which expired on May 16, 2016. (R. 10 at PageID.589-90).  When Plaintiff had an allergic reaction, he was switched to another antibiotic, and his rash was relieved with medication. (*Id.* at PageID.601). On the day he was discharged, his incision no longer demonstrated any signs of infection. (*Id.* at PageID.588).

Plaintiff also argues that the ALJ "should not have found that any of the surgeries resolved Plaintiff's symptoms." (R. 14 at PageID.1047) (citing (R. 10 at PageID.360) (brief to Appeals Council)). But the ALJ never found Plaintiff's symptoms were entirely resolved by surgery. Rather, the ALJ observed that "the medical record indicates he recovered from and experienced improvement in his conditions as a result of" his lumbar fusion surgery in November 2014 and femoral bypass surgery in 2016. (R. 10 at PageID.115).

I suggest substantial evidence supports this finding. In the months leading up to Plaintiff's lumbar fusion surgery, he had reported worsening pain running from his lower back down his left leg. *E.g.*, (R. 10 at PageID.367, 370, 372, 378 (June 2014 emergency room visit for back pain radiating into left leg "like an electric shock"), 398, 421). After Plaintiff underwent lumbar fusion surgery in November 2014, (*id.* at PageID.418-26), he reported in February 2015 that his back was improving and he was able to rise from a chair without significant pain, (*id.* at PageID.465). Though he continued to use a cane, he could move around "relatively well without it," despite being stiff. (*Id.*). As of April 9, 2015, he

23

still had some discomfort but looked and was moving around "much better." (*Id.* at PageID.464). He was walking without a cane and had a stable gait. (*Id.*).

The record contains no treatment for Plaintiff's spine disorder between mid-2015[5] and January 16, 2017. In the meantime, Plaintiff underwent a femoral bypass in 2016 because he had developed left lower extremity claudication and had pain after walking 100 feet. (*Id.* at PageID.115, 577). After the bypass, his leg pain improved and he was able to walk half a mile without difficulty. (*Id.* at PageID.115) (citing 654-57 ("The patient reports today that his leg pain with exercise has improved since his bypass surgery."); 665-68, 669-72, 874-87).

In January 2017, a physical examination revealed diminished monofilament sensation in a left L4 distribution. (*Id.* at PageID.893). A lumbar spine MRI later that month[6] showed: (1) Marked diffuse spinal stenosis due to congenital narrowing from shortened pedicles as well as prominent epidural fat; (2) interval postsurgical changes at the L5-S1 level, with the canal slightly more capacious at the disc level but still severe stenosis above the disc level; (3) multilevel degenerative changes, contributing to varying degrees of spinal and neural foraminal stenosis, as well as left foraminal nerve root impingement at the L2-L3 and L3-L4 levels. (*Id.* at PageID.743-45, 1006-08). Treatment

---

[5] The ALJ says there was no evidence of treatment for Plaintiff's spine disorder between April 2015 and January 16, 2017. (R. 10 at PageID.112). Plaintiff did attend an appointment at Jackson Family Medical in June 2015 at which his back and leg pain were noted to be "stable." (*Id.* at PageID.500).

[6] This lumbar MRI appears twice in the record, (*compare* R. 10 at PageID.743-45, *with id.* at PageID.1006-08), and the ALJ appears to have interpreted its two occurrences as two separate instances of imaging, (*id.* at PageID.112-13). Neither party apparently noticed this error; Plaintiff does not allege it harmed him in any way, and I do not see that it did.

notes from March 2017 indicated Plaintiff was able to walk around his house and a half a mile to get his mail with no difficulty; he reported his leg pain with exercise had improved since his bypass surgery. (*Id.* at PageID.113) (citing *id.* at PageID.906-07). The ALJ acknowledged that Plaintiff reported occasional sharp pain in his left leg and no feeling in his feet or toes. (*Id.*). Though walking "long distances" caused fatigue, it did not stop him from reaching his destination, and the fatigue resolved five or six minutes after he stopped. (*Id.*). NP Ann Luciano recommended he continue walking at least 30 minutes daily and follow up in 6 months. (*Id.* at PageID.113) (citing *id.* at PageID.908-09).

After recounting the above medical evidence, the ALJ explained he would account for Plaintiff's lumbar spine disorder by limiting him to light exertional work, with reduced postural activities. (*Id.* at PageID.113). The ALJ noted that Plaintiff was able to walk independently with a steady gait, and had full strength in all major muscle groups. (*Id.*). I suggest the above evidence sufficiently supports the ALJ's conclusion that Plaintiff recovered from and experienced improvement with his lumbar fusion and bypass surgeries.

## 2. Remand is Not Warranted Under Sentence Six

Plaintiff discusses two pieces of evidence generated *after* the ALJ issued his decision on August 16, 2017, (R. 10 at PageID.119): an October 3, 2017 femoral-popliteal bypass graft that "was attempted . . . but was unsuccessful," and a February 27, 2018 "Second Opinion" from the Cleveland Clinic. (R. 12 at PageID.1017). As mentioned above, the court is limited to considering evidence presented to the ALJ, and any evidence submitted to the Appeals Council instead is not part of the record for the purposes of judicial review. *See Cline*, 96 F.3d at 148. The court can consider evidence submitted after

25

the record was closed only to determine whether remand is warranted under the sixth sentence of 42 U.S.C. § 405(g). Sentence six provides for remand where the claimant presents (1) evidence that "is both 'new' and 'material,'" and (2) "good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).

Presumably at least some of the evidence is "new," since the medical records regarding Plaintiff's October 2017 bypass graft are necessarily dated after the ALJ's decision; the record does not contain a copy of the "Second Opinion," but Plaintiff asserts it is also dated after the ALJ's decision and apparently regards next steps after the failed October 2017 bypass. Plaintiff has not presented enough information for me to say that his evidence is material, however—in particular, he has not explained how the evidence is relevant to the time period at issue. Evidence is considered material only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357 (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F. 2d 709, 711 (6th Cir. 1988)). And where evidence shows a claimant's condition deteriorated after the decision, the proper remedy is not remand, but a new claim of benefits. *Sizemore*, 865 F.3d at 712. Thus, I do not see that remand is warranted under sentence six on the basis of either of these pieces of evidence.

26

### 3. Remand is Not Warranted Based on New Arguments Raised in Plaintiff's Response

Plaintiff's response repeats his entire motion, but also adds a few pieces of evidence (discussed above) and presents several arguments for the first time. The Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived." *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). Further, it is difficult to understand the basis for Plaintiff's arguments, and they appear meritless.

For example, Plaintiff asserts that the ALJ "choose [sic] to ignore testimony" of the VE. (R. 14 at PageID.1046). His brief does not explain what testimony the ALJ ignored or how it affected him, or provide any quotations, but rather cites generally to PageID.118-19 and PageID.156. (*Id.*). His complaint provides some clarity: "Residual Functional Capacity reduced to pain and side effects from medication is below less then it would take to perform work being off task 30% or 3days is inconsistent with competitive work. The [VE] noted this fact during the hearing . . . however the judge chose to contradict the findings." (R. 1 at PageID.4) (*sic* throughout). It appears Plaintiff has misunderstood the hearing testimony. The VE, responding to a hypothetical situation posed by the ALJ, testified that *if* a person were off task 25 percent of the workday or more due to "pain, varied relative symptoms, attention, [and] concentration difficulties," no work would be available. (R. 10 at PageID.156). The VE did not testify that Plaintiff, himself, had any particular RFC or that Plaintiff, himself, would be off-task any amount of time. Those findings are the province of the ALJ. Here, the ALJ did not find that Plaintiff would be off-task any significant amount of time, and thus did not include the above hypothetical limitation in Plaintiff's RFC. (*Id.* at PageID.110). Plaintiff appears to rely solely on the VE's testimony on this

point, and does not present any other record evidence to contradict this portion of the ALJ's findings. Thus, I suggest the court reject Plaintiff's argument that the ALJ ignored the VE's testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779-80 (6th Cir. 1987) (ALJ not required to rely on VE testimony regarding limitations that ALJ does not credit).

Additionally, Plaintiff raises a concern about two misstatements in Defendant's motion: (1) "History of deep vein thrombosis is in reference to RIGHT leg without corrective surgery," and (2) "Plaintiff reference in complaint about being 'Off-Task' was a hypothetical example of in a 'Week' not a 'Month.'" (R. 14 at PageID.1046). I cannot ascertain to what Plaintiff's first complaint refers. Defendant's brief correctly recounts that Plaintiff has "left lower extremity claudication and right lower extremity deep vein thrombosis." (R. 13 at PageID.1033). As for Plaintiff's second concern, I surmise that the reference in his complaint to "being off task 30% or 3[]days" (R. 1 at PageID.4) was intended to be *per week*—though no time element was specified—and Plaintiff is concerned that Defendant assumed he was alleging he would be off task only three days *per month*, (R. 13 at PageID.1039). But either would be work preclusive, and regardless, Defendant's point stands: Plaintiff did not identify any evidence or opinion, even his own testimony, supporting his alleged limitation. I therefore suggest Plaintiff's arguments fail.

### 4. The ALJ Erred at Step Five By Failing To Provide Evidence That Work Plaintiff Could Perform Exists in Significant Numbers

I suggest, however, that remand is warranted on another basis. That Plaintiff did not raise this particular argument "does not prevent the Court from identifying error based on

its own review of the record and ruling accordingly." *Buhl v. Comm'r of Soc. Sec.*, No. 12-10087, 2013 WL 878772, at *7 n.5 (E.D. Mich. Feb. 13, 2013), *Rep. & Rec. adopted by* 2013 WL 878918 (E.D. Mich. Mar. 8, 2013). As one court in this district stated, "Notably, in Social Security cases, the failure to submit a particular legal argument is 'not a prerequisite to the Court's reaching a decision on the merits' or a finding, *sua sponte*, that grounds for reversal." *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *11 n.2 (E.D. Mich. Sept. 25, 2013) (citation omitted); see also *Andras v. Comm'r of Soc. Sec.*, No. 18-cv-10192, 2019 WL 1246253, at *4 n.2 (E.D. Mich. Feb. 11, 2019) ("Though Andras did not raise a step three error . . . [t]he Court may raise such an obvious and significant legal error sua sponte."), *Rep. & Rec. adopted*, 2019 WL 1242228 (E.D. Mich. Mar. 18, 2019); *Trainor v. Comm'r of Soc. Sec.*, No. 13-10093, 2014 WL 988993, at *23 (E.D. Mich. Mar. 13, 2014) ("Although none of Trainor's arguments justify remand, her arguments did require the Court to review the administrative record in some detail. During that review, an error in the proceedings before the ALJ revealed itself. . . . Although this Court does not generally raise issues sua sponte, it is warranted in this case.").

At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). "In order to support a finding that you are not disabled at this fifth

step of the sequential evaluation process, [the Commissioner is] responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors." 20 C.F.R. § 416.960(c)(2). To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley*, 820 F.2d at 779 (quoting *O'Banner v. Sec'y of Health, Edu. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only "if the question accurately portrays [plaintiff's] individual physical and mental impairments." *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)).

Here, Plaintiff's ultimate RFC limits him to "*occasional* reaching overhead and frequently reaching below head level with the right upper extremity," (R. 10 at PageID.110) (emphasis added), presumably to account for the "degenerative joint disease/tendinosis of the right shoulder," which the ALJ found to be a severe impairment, (*id.* at PageID.106). But the ALJ never posed a hypothetical including a limitation to occasional reaching overhead with the right arm. Nor does the VE's testimony offer any clues as to how he would have answered if given that limitation.

Rather, at the hearing, the ALJ asked the VE about a hypothetical person "limited *to overhead reaching* with the right dominant arm." (*Id.* at PageID.155) (emphasis added). That ambiguous phrase could mean either (1) "no overhead reaching with the left, non-dominant arm" or (2) "no reaching in directions other than overhead with the right, dominant arm." Neither makes much sense, considering that Plaintiff did not allege any

30

limitations to his left arm and that the ALJ's very next limitation was to "frequent reaching below head level with the right arm." It seems most likely a word describing frequency is missing, either because the ALJ misspoke or due to a transcription error.

If the ALJ asked about a person "limited to overhead reaching with the right dominant arm," the VE presumably listed jobs that account for that limitation, *not* the limitation in the final RFC, "occasional reaching overhead . . . with the right upper extremity." (*Id.* at PageID.110). It is unclear how the change might have affected the VE's testimony. He named three available positions: Cashier II, Office Helper, and Laundry Worker. (*Id.* at PageID.155-56). According to the Dictionary of Occupational Titles, Cashier II and Office Helper both require *frequent* reaching, and Laundry Worker requires *constant* reaching. *Dictionary of Occupational Titles*, 211.462-010, 1991 WL 671840 (Cashier II); 239.567-010, 1991 WL 672232 (Office Helper); 302.685-010, 1991 WL 672657 (Laundry Worker, Domestic). Thus, the VE's answer as to reaching appears to be based on his experience and expertise, rather than the Dictionary of Occupational Titles, and I am unable to evaluate whether the jobs listed by the VE would remain available for a person limited to only occasional reaching overhead with the dominant right arm.

Because I am unable to say that this error was harmless, I find the Commissioner failed to carry its burden at step five and suggest substantial evidence does not support the Commissioner's decision. I therefore recommend this case be remanded so that an accurate hypothetical, encompassing all of Plaintiff's limitations, may be posed to a VE.

31

### H. Conclusion

For the reasons stated above, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 14), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 16), be **DENIED**, and this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file

a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  July 18, 2019                                 S/ PATRICIA T. MORRIS
                                                     Patricia T. Morris
                                                     United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 18, 2019                                  By s/Kristen Castaneda
                                                     Case Manager